**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**
**DIVISION II**

FILED
COURT OF APPEALS
DIVISION II

2015 MAY 27 AM 9: 30

STATE OF WASHINGTON

BY_____
        DEPUTY

STATE OF WASHINGTON,

                  Respondent,

   v.

BARON DELL ASHLEY JR.,

                  Appellant.

No. 45173-5-II

ORDER ON MOTION TO RECONSIDER,
WITHDRAWING OPINION AND FILING
NEW PART PUBLISHED OPINION

The part published opinion in this case was filed on February 18, 2015. The appellant filed a motion for reconsideration on March 11, 2015. At our request, the respondent filed an answer to this motion on March 30, 2015.

Upon reconsideration, the court has decided to withdraw the part published opinion filed on February 18, 2015. It is, therefore,

**ORDERED:**

The part-published opinion filed in this case on February 18, 2015 is hereby withdrawn and the new part-published opinion is attached to this order.

**DATED** this 27th day of _____May_____, 2015.

_____
JOHANSON, C.J.

We concur:

_____
MAXA, J.

_____
SUTTON, J.

FILED
COURT OF APPEALS
DIVISION II

2015 MAY 27 AM 9: 31

STATE OF WASHINGTON

BY_____
DEPUTY

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 45173-5-II |
| Respondent, | |
| v. | |
| BARON DELL ASHLEY JR., | PART PUBLISHED OPINION |
| Appellant. | |

JOHANSON, C.J. — Baron Dell Ashley Jr. appeals his jury trial conviction for unlawful imprisonment (domestic violence),[1] his offender score calculation, and the imposition of legal financial obligations (LFOs). He argues that the trial court erred when it included a prior attempted second degree assault juvenile adjudication as one point in his offender score because it did not qualify as a violent offense under RCW 9.94A.030(54). In the published portion of this opinion, we hold that the trial court did not err in counting the prior attempted second degree assault juvenile adjudication as one point and adopt the reasoning set forth in Division One of this court's opinion *State v. Becker*, 59 Wn. App. 848, 801 P.2d 1015 (1990). Ashley further argues that the trial court

---

[1] RCW 9A.40.040(1); RCW 10.99.020(5).

erred in (1) admitting evidence of prior acts of domestic violence under ER 404(b) and (2) imposing LFOs. In the unpublished portion of this opinion, we hold that the trial court did not abuse its discretion in admitting the prior bad acts evidence and that the trial court erred in imposing LFOs without inquiring about Ashley's future ability to pay. Accordingly, we affirm Ashley's conviction and the calculation of his offender score, but we reverse the LFOs and remand for a new LFO hearing.

## FACTS

A jury found Ashley guilty of unlawful imprisonment (domestic violence).[2] The trial court calculated Ashley's sentence with a seven-point offender score, which included one point for Ashley's 1999 attempted second degree assault juvenile adjudication. Ashley challenges his offender score calculation.

## ANALYSIS

Ashley argues that the trial court erred in scoring his 1999 attempted second degree assault juvenile adjudication as one point in his offender score. He contends that because this was an attempt offense, it did not qualify as a violent offense under RCW 9.94A.030(54) and it should have counted only as one-half a point. We disagree.

RCW 9.94A.525 establishes how to calculate a defendant's offender score. RCW 9.94A.525(7) provides, "If the present conviction is for a nonviolent offense and not covered by subsection (11), (12), or (13) of this section, count one point for each adult prior felony conviction and *one point for each juvenile prior violent felony conviction* and 1/2 point for each juvenile prior

---

[2] We describe the background facts and procedure in more detail in the unpublished portion of this opinion.

nonviolent felony conviction." (Emphasis added.) RCW 9.94A.030(54) defines a "violent offense" as including, among other offenses, "[a]ny felony defined under any law as a class A felony or an attempt to commit a class A felony" and second degree assault. RCW 9.94A.030(54)(a)(i), (viii). It does not include attempted second degree assault in this definition. Ashley argues that because attempted second degree assault does not fall under RCW 9.94A.030(54)'s violent offense definition, the trial court erred when it assigned one point to his offender score for that offense rather than one-half a point.

But RCW 9.94A.525(4) requires the sentencing court to "[s]core prior convictions for felony anticipatory offenses (attempts, criminal solicitations, and criminal conspiracies) the same as if they were convictions for completed offenses." Thus, under RCW 9.94A.525(4), Ashley's prior attempted second degree assault would be treated as a completed second degree assault for purposes of calculating his offender score. Because second degree assault is a violent offense under RCW 9.94A.030(54)(a)(viii), RCW 9.94A.525(4) provides that the resulting offender score for that offense would be one point. As a result, it could be argued that RCW 9.94A.030(54) and RCW 9.94A.525(4) conflict.

Division One of this court addressed a substantially similar issue in *Becker*, 59 Wn. App. 848. In *Becker*, the sentencing court counted a prior attempted second degree robbery conviction as two points under former subsection (9) of the former offender score statute, RCW 9.94A.360 (1990), which is now codified as RCW 9.94A.525(8). 59 Wn. App. at 851. Similar to RCW 9.94A.525(7), the provision at issue here, former RCW 9.94A.360(9) provided for a higher offender score for prior violent felony convictions:

> If the present conviction is for a violent offense and not covered in subsection (10), (11), (12), or (13) of this section, *count two points for each prior adult and juvenile*

3

*violent felony conviction*, one point for each prior adult nonviolent felony conviction, and 1/2 point for each prior juvenile nonviolent felony conviction.

(Emphasis added.)

On appeal, Becker argued that his prior attempted robbery conviction did not count as two points in his offender score because it was not defined as a "violent offense" under the general definitional statute, former RCW 9.94A.030(29) (1988) (now RCW 9.94A.030(54)). *Becker*, 59 Wn. App. at 850-51. Noting an "apparent" conflict between the former definitional statute and the former offender score statute, Division One held that the plain language of the statutes did not conflict and, instead, could be harmonized:

> The apparent conflict in the sections is based on the assumption that the attempted robbery can only receive two points if it is a "violent offense". Contrary to Becker's contention, the offense does not receive two points because it is a violent offense, but rather, *it receives two points because the completed crime of robbery in the second degree would receive two points and the attempted robbery is to be treated as a completed crime.* According to the plain language of [former] RCW 9.94A.360(5) the attempt must be treated the same as the completed crime. Such a reading of the two sections gives effect to each section and does not distort the language of the sections.

*Becker*, 59 Wn. App. at 852. Division One subsequently followed *Becker* in *State v. Howell*, 102 Wn. App. 288, 292-95, 6 P.3d 1201 (2000), and Division Three has followed *Becker* in *State v. Knight*, 134 Wn. App. 103, 138 P.3d 1114 (2006), *aff'd,* 162 Wn.2d 806, 174 P.3d 1167 (2008). The same reasoning applies here.

Ashley argues that *Becker* and *Knight* were wrongly decided because they "did not adequately take into account the fact that, where the definitional section of the [Sentencing Reform Act of 1981], [RCW 9.94A].030, provides that certain offenses are violent offenses, non-listed offenses are definitionally not violent offenses." Reply Br. of Appellant at 5. He contends that definitional statutes are "integral to the statutory scheme and must be given effect." Reply Br. of

No. 45173-5-II

Appellant at 5. We disagree that *Becker* and *Knight* did not give effect to the definitional statute; they did so by harmonizing the definitional statute with the offender score statute.

Ashley also argues that any ambiguity must be resolved in his favor under the rule of lenity. But because the approach in *Becker* harmonizes the plain language of the statutes, there is no ambiguity and the rule of lenity does not apply. We also note that the legislature's failure to amend the statutes in the 24 years since *Becker* was issued reflects its acquiescence to the court's conclusions in that case. *See State v. Berlin*, 133 Wn.2d 541, 558, 947 P.2d 700 (1997) ("The failure of the Legislature to amend a statute to change the statute's judicial construction is reflective of legislative acquiescence in the Court's interpretation.").

For the reasons stated in *Becker*, and by harmonizing the definitional and offender score statutes, we conclude that the trial court did not err in treating the attempted second degree assault the same as the completed crime and including this prior offense as one point in Ashley's offender score.

We affirm Ashley's conviction and his offender score calculation.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Ashley further argues that the trial court erred in (1) admitting prior bad acts evidence under ER 404(b) and (2) imposing the LFOs. These arguments also fail.

ADDITIONAL FACTS

I. BACKGROUND

On May 27, 2013, officers from the Vancouver Police Department arrived at Ashley's sister's apartment to arrest Ashley and his sister on outstanding arrest warrants. The officers knocked repeatedly on the door. Although the officers had initially heard voices inside the apartment, no one responded.

About 45 minutes later, the officers obtained a key from the apartment manager and announced that they had a key and were opening the door. When they opened the door, the officers called out to anyone inside the apartment, explained they were the police and were not going away, and asked the people inside to come out. Makayla Gamble, Ashley's former girlfriend, and her children met the officers in the downstairs living area.

Once Gamble was outside, the officers asked Gamble if Ashley was inside, and she told them that he was upstairs. She also told the officers that Ashley had detained her in the bathroom.

II. PROCEDURE

A. MOTION TO ADMIT PRIOR BAD ACTS EVIDENCE

The State charged Ashley by amended information with unlawful imprisonment (domestic violence). Before trial, the State moved to introduce evidence of Ashley's prior domestic violence against Gamble. The State argued that this evidence was to show why Ashley was able to keep Gamble in the bathroom without her consent despite the lack of any explicit threat.

At the motion hearing, Gamble testified that she had been in a relationship with Ashley from 2000 to 2005, and that he was the father of two of her children. She testified that she and her children were visiting Gamble's sister when the police arrived and that Ashley had put her and her

infant in an upstairs bathroom so the police would not hear them. She remained in the bathroom for 40 to 50 minutes despite her telling Ashley several times that she wanted to leave. She further testified that she did not feel free to leave—in part because prior domestic abuse by Ashley caused her to fear Ashley. She stated that if it had not been for her history with Ashley, she would have gone downstairs rather than stay in the upstairs bathroom.

Gamble also testified about several past domestic violence incidents that happened between 2000 and 2008. Gamble stated that she had reported only one incident, a 2004 incident, to the police, but she then "dropped it." 1A Report of Proceedings (RP) at 78. In addition, Gamble testified that she still feared Ashley and that she felt unsafe when she was in the bathroom because of his assaultive history. But she admitted that Ashley did not expressly threaten her when he told her to go in the bathroom and be quiet.

The State argued that Ashley's prior violence against Gamble explained the dynamics of their relationship and would help the jury understand why Ashley was able to control Gamble's behavior without any express threats and why Gamble initially complied with Ashley's directions and did not yell for help. The State further argued that although the past acts of violence occurred several years earlier, these acts were still relevant because Gamble was aware that Ashley was capable of violence against her. Ashley argued that the trial court should not admit this evidence because the State was not using it to establish an element of the offense, it was not relevant to Gamble's credibility because she was not recanting her earlier statements, Gamble's testimony and the single police report from 2004 were not sufficient to establish the prior acts by a preponderance of the evidence, and the passage of time had made the incidents less probative.

The trial court found that (1) Gamble's testimony established the prior acts of violence by a preponderance of the evidence, (2) the purpose of the evidence was to show the restraint was without her consent because of her ongoing fear based on this history, and (3) the probative value of the prior acts evidence outweighed the possible prejudice. The trial court admitted the prior domestic violence evidence and invited the parties to submit limiting instructions related to this evidence.

## B. TRIAL

At trial, Gamble testified that when the police arrived on May 27, Ashley forced her to remain in an upstairs bathroom. Gamble told Ashley twice that she wanted to leave the bathroom and to go home; Ashley did not respond. She also tried to open the door three or four times, but Ashley would close it again. Once when she opened the door, Ashley was in the hallway, and when he saw her open the door, "his face was different," and "he looked pissed off." 1B RP at 195.

Gamble also testified about four instances of past physical abuse that occurred from 2000 to 2005. She testified that she had only called the police after the 2004 incident and that she later recanted her allegations because she loved Ashley. In addition, Gamble testified that she had only seen Ashley three or four times since 2008.

On cross-examination, Gamble admitted that Ashley did not yell at her, threaten her, or physically force her into the bathroom. And she agreed that she "remained in the bathroom under [her] own power." 1B RP at 203. But on redirect, Gamble reiterated that Ashley did not have to threaten to harm her to keep her in the bathroom because she was still afraid of him given their

past history and because all he had to do was to look at her a certain way and she would comply. Ashley did not call any witnesses.

The jury found Ashley guilty of unlawful imprisonment (domestic violence). Ashley argued at sentencing that he did not have the current or future ability to pay LFOs, noting that he was currently indigent, that he already owed over $6,000 in child support or outstanding LFOs from previous convictions, that he had four children, and that he was being incarcerated for up to 33 months. The trial court responded that it was imposing LFOs because Ashley had not made a "showing that he is unable to work and has future inability to pay." 1B RP at 321. The trial court imposed $3,420 in LFOs: (1) a $500 victim assessment, (2) a $100 domestic violence assessment, (3) $520 in court costs, (4) $1,700 fees for court-appointed attorney and trial per diem, (5) a $500 fine, and (6) a $100 deoxyribonucleic acid collection fee. It also noted that restitution and costs for any court-appointed defense experts or other defense costs were to be set at a later date. The judgment and sentence does not, however, contain any findings regarding Ashley's ability to pay LFOs.

## ADDITIONAL ANALYSIS

### I. ER 404(B) EVIDENCE

Ashley argues that the trial court erred in admitting the prior bad acts evidence under ER 404(b) because (1) the State failed to prove the prior acts by a preponderance of the evidence, (2) the evidence was not relevant to an element of the crime, and (3) the evidence was overly prejudicial because the prior acts were too remote in time to be probative. We disagree.

No. 45173-5-II

A. STANDARD OF REVIEW AND ER 404(b) ANALYSIS

We review a trial court's evidentiary rulings for abuse of discretion. *State v. Finch*, 137 Wn.2d 792, 810, 975 P.2d 967 (1999). A trial court abuses its discretion when its evidentiary ruling is "'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" *State v. Downing*, 151 Wn.2d 265, 272, 87 P.3d 1169 (2004) (quoting *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)). It is the appellant's burden to prove abuse of discretion. *State v. Wade*, 138 Wn.2d 460, 464, 979 P.2d 850 (1999).

ER 404(b) prohibits the admission of evidence of other crimes, wrongs, or acts "'to prove the character of a person in order to show action in conformity therewith.'" *State v. Foxhoven*, 161 Wn.2d 168, 174-75, 163 P.3d 786 (2007) (quoting ER 404(b)). Before admitting prior bad acts evidence, the trial court must "'(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.'" *Foxhoven*, 161 Wn.2d at 175 (quoting *State v. Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). "Preponderance of the evidence means that considering all the evidence, the proposition asserted must be more probably true than not." *State v. Ginn*, 128 Wn. App. 872, 878, 117 P.3d 1155 (2005).

B. PROOF OF PRIOR BAD ACTS

Ashley argues that the evidence did not establish the prior bad acts by a preponderance because Gamble did not provide any police or medical documentation of the incidents and because Gamble admitted that she called the police to report only one of the incidents and then recanted her allegations. We disagree.

No. 45173-5-II

At the motion hearing, Gamble testified about each of the incidents she later described to the jury, that testimony was not disputed, and the trial court apparently found Gamble's testimony credible. Ashley cites to no authority establishing that a witness's testimony alone cannot establish a fact by a preponderance of the evidence. Furthermore, to the extent the trial court's decision rested on it finding Gamble's testimony credible, we do not review a trial court's credibility determinations. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). Accordingly, this argument fails.

C. RELEVANCE

Ashley next argues that the evidence was not relevant to an element of the crime. Again, we disagree.

A person commits unlawful imprisonment if he "knowingly restrains another person." RCW 9A.40.040(1). RCW 9A.40.010(6) provides,

> "Restrain" means to restrict a person's movements *without consent* and without legal authority in a manner which interferes substantially with his or her liberty. Restraint is "without consent" if it is accomplished by (a) physical force, *intimidation*, or deception.

(Emphasis added.) The trial court expressly found that the purpose of the evidence was to show that the restraint was without Gamble's consent because of her ongoing fear based on Ashley's history of violence with her. Essentially, the trial court found that the domestic violence evidence was material and relevant to both Gamble's lack of consent and to whether Ashley accomplished the restraint by intimidation. We agree that personal history with a violent person can certainly be

11

relevant to whether a particular action or behavior amounts to intimidation from the victim's perspective.[3]  Accordingly, this argument fails.

### D.  PROBATIVE VS. PREJUDICIAL VALUE

Ashley next argues that because the domestic violence incidents occurred several years before this incident, they were too remote to be probative, and, thus, the trial court erred when it determined that their prejudicial value did not outweigh any probative value.  Again, we disagree.

Although the evidence of the prior domestic violence incidents is potentially highly prejudicial, that evidence was also highly probative in this instance because the State claimed that Ashley had restrained Gamble through the use of a subtle form of intimidation that the jury could fully understand if it was aware only of the violent nature of Gamble and Ashley's relationship.  Although the prior incidents had taken place several years earlier, this history was still highly relevant to how Gamble perceived the situation, and Gamble's testimony about her relative lack of contact with Ashley in recent years explained why these incidents were so dated.  Accordingly, this argument fails.

The trial court conducted the proper ER 404(b) analysis, and Ashley does not show that its findings were improper.  Thus, we hold that the trial court did not abuse its discretion when it admitted this evidence.

---

[3] Citing *State v. Magers*, 164 Wn.2d 174, 189 P.3d 126 (2008), and *State v. Baker*, 162 Wn. App. 468, 475, 259 P.3d 270 (2011), Ashley also argues that "this sort of prior act evidence is appropriate in cases where the alleged victim recants, to show why she might do so out of fear, which was not the circumstance here."  Br. of Appellant at 6.  Although these cases state that prior domestic violence evidence is admissible "to assist the jury in judging the credibility of a recanting victim," these cases do not establish that this is the *only* purpose for which the trial court can admit such evidence.  *Magers*, 164 Wn.2d at 186; *see also Baker*, 162 Wn. App. at 474-75.

## II. LFOs

Finally, Ashley challenges his LFOs, arguing that (1) the trial court erred in requiring him to prove his future inability to pay LFOs, and (2) the trial court's finding of no showing of future inability to pay was not supported by any evidence. Based on our Supreme Court's recent decision in *State v. Blazina*, ___ Wn.2d ___, 344 P.3d 680 (2015), we agree that the trial court failed to make an adequate individualized inquiry into Ashley's future ability to pay.[4]

As a preliminary matter, the State argues that Ashley did not preserve this issue for review and that it is within our discretion to decline to consider it.[5] But Ashley clearly argued at sentencing that he did not have the current or future ability to pay LFOs. Thus, we cannot decline to consider this issue under RAP 2.5(a).

Our Supreme Court recently held that the "trial court has a statutory obligation to make an individualized inquiry into a defendant's current and future ability to pay before the court imposes LFOs." *Blazina*, 344 P.3d at 681, 685. Although Ashley presented information relevant to his current ability to pay and his ability to pay during his incarceration, he did not present any information about his work experience, education, work skills, or potential employment prospects upon release from prison. Even though the trial court recognized that Ashley had not presented any evidence demonstrating he would be unable to pay LFOs after his release, it did not inquire further into any factors that would have been relevant to its decision to impose LFOs. *Blazina* has

---

[4] The parties have addressed *Blazina* in a motion for reconsideration and an answer to the motion for reconsideration.

[5] The State also argues that this issue is not ripe for review because the State has not attempted to collect the LFOs. Our Supreme Court recently rejected the State's ripeness argument in *Blazina*, 344 P.3d 680 n.1. Accordingly, the fact that the State may not yet be attempting to collect Ashley's LFOs does not preclude our review of this issue.

13

No. 45173-5-II

clarified that it is the *trial court's* statutory obligation to make an "individualized inquiry" into such matters. 344 P.3d at 685. The trial court failed to do so here. Accordingly, we reverse the LFOs and remand for a new LFO hearing.

We affirm Ashley's conviction and offender score, but we reverse the LFOs and remand for a new LFO hearing.

Johanson, C.J.

JOHANSON, C.J.

We concur:

MAXA, J.

SUTTON, J.

14